UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| UNITED STATES OF AMERICA | ) <br> ) <br> ) |
| v. | ) 2:21-cr-00132-JDL-1 <br> ) |
| DEREK GERRISH, | ) <br> ) |
| Defendant. | ) |

**ORDER ON DEFENDANT DEREK GERRISH'S MOTION TO SUPPRESS**

Defendant Derek Gerrish moves to suppress (ECF No. 49) evidence seized during a search of his vehicle.[1] Gerrish argues that there was no reasonable suspicion to detain him and that his initial detention was an arrest without probable cause, so the fruits of that detention must be suppressed. Gerrish also argues that his state bail conditions authorizing searches of his person, vehicle, and residence at any time without articulable suspicion or probable cause violate the Fourth Amendment. For the reasons that follow, I deny the motion.

**I. FACTUAL FINDINGS**

The Scarborough Police Department received a complaint on June 1, 2021 from a hotel's staff member about possible drug trafficking and prostitution at the hotel by some of its guests. Criminal activity, including drug trafficking, has occurred with

---

[1] Gerrish's motion to suppress references both a search of his vehicle and a search of his person, and the motion specifies that he is seeking "an order suppressing all evidence collected in violation of the United States Constitution." ECF No. 49 at 1. There was no testimony at the evidentiary hearing, which was held on March 25, 2022, as to any search of Gerrish. However, if Gerrish was himself searched during his investigatory detention, I would conclude that such a search was permissible for the same reasons that I conclude the same about the search of his car. *See infra* Section II.B.

some frequency at the hotel, and staff had previously provided tips that resulted in successful investigations.

In response to the June 1 tip, two plainclothes officers stationed themselves in a parked, unmarked police car in the parking lot of the business next-door, which gave them an elevated vantage point to observe the hotel's parking lot. Shortly after 2 p.m., the officers saw two cars pull into the hotel's parking lot and back into adjacent spots directly downhill from the officers' location, approximately 10 to 12 feet away. Although the hotel's parking lot was relatively empty, the cars had parked far from the hotel's main entrance. One of the vehicles was a Chrysler 300, and the other was a Toyota Avalon. Each had two occupants. Both cars were registered to owners with Maine addresses not far from the hotel.

The officers saw a woman exit the front passenger door of the Chrysler and walk unsteadily to the main entrance of the hotel. She appeared either intoxicated or sick. The woman then returned from inside the hotel to the Chrysler and lay down so that her torso was inside the car and her legs were outside. One of the officers called the hotel's front desk to ask what the woman had done while inside. He was told that she had rented a room and that it was not ready.

While this was happening, Defendant Gerrish, the driver of the Chrysler, was speaking and gesturing to the male passenger of the Toyota. He also exited his car and then reentered it. Because of the incline, the officers were well positioned to see into both cars through their back windshields. The officers saw the driver of the Toyota holding a syringe and flicking its top as if she was getting ready to inject it.

Upon seeing the syringe, one of the officers radioed to a uniformed officer who was nearby in a police cruiser. As that third officer drove into the hotel parking lot with his lights and siren off, the two plainclothes officers exited their car and approached the Chrysler and the Toyota, one toward the passenger side of the Chrysler where the unsteady woman was lying down and the other toward the driver side of the Toyota where the other woman had the syringe. The two officers identified themselves as police. The third police officer parked his cruiser in front of the Toyota at a 45-degree angle, blocking the Toyota without blocking the Chrysler. The uniformed officer exited his car and approached the passenger of the Toyota, the man who had been speaking with Gerrish.

The woman in the Toyota who had been holding the syringe identified herself to the plainclothes officer who had approached her. Now closer, the officer saw that the syringe contained a reddish-brown liquid resembling heroin or fentanyl. The uniformed officer asked the male passenger of the Toyota what was in the syringe, and the passenger responded that it was "dope." The officers directed the woman and the man to exit the Toyota, which they did. The woman stated that there were two more loaded syringes in the car, which the officers found during a search, along with other drug paraphernalia. The woman also stated that she was there to meet Gerrish, who she identified by name.

While those events were unfolding at the Toyota, Gerrish and his unsteady passenger identified themselves to the plainclothes officer who had approached the Chrysler. Gerrish asked if he could get out of the car. The officer agreed and met Gerrish by the front of the Chrysler. The officer asked Gerrish whether he was on

3

any bail conditions, and Gerrish stated that he was. The officer asked if the conditions allowed for searches, and Gerrish said yes. In response to a question about what he was on bail for, Gerrish told the officer "everything." Asked what "everything" referred to, Gerrish said robbery, theft, and assault. The officer radioed to dispatch to confirm that Gerrish was on bail and that his conditions allowed for searches.

At the time of the stop, Gerrish was subject to at least six separate sets of bail conditions, including for charges related to drug trafficking and possession of hypodermic apparatuses. Five contained provisions requiring him to submit to suspicionless searches at any time of his person, vehicle, or residence to determine whether he had violated other bail conditions relating to alcohol, drugs, or weapons. The officer who had been questioning Gerrish told Gerrish that he would search the Chrysler for two reasons: first, because the bail conditions allowed it, and, second, because Gerrish was talking to a person in the Toyota and the officers had observed the driver of that vehicle preparing to inject drugs. During the Chrysler search, Gerrish was standing 5 to 10 feet away with a fourth officer who had just arrived. A fifth officer had also responded to the scene by this time.

The search of the Chrysler revealed a bag containing what the officer immediately recognized as fingers of either heroin or fentanyl.[2] At that point, the officer placed Gerrish in handcuffs. The officer then found two handguns, several magazines, and additional illegal drugs in the passenger's side floorboard of the

---

[2] "[A] 'finger' is a ten-gram cylinder of drugs in powder form." *United States v. Balser*, Criminal No. 19-cr-230, 2020 WL 7496097, at *1 (D.N.H. Dec. 21, 2020).

Chrysler. Upon the discovery of the guns, an officer handcuffed the woman who had been observed in the other car with the syringe.

## II.  LEGAL ANALYSIS

### A.  The *Terry* Stop

Gerrish first argues that the officers lacked reasonable suspicion that he was engaged in criminal activity and that the officers' approach of him was tantamount to an arrest without probable cause. Thus, he contends that his encounter with the police was unconstitutional from its inception and that the fruits of it should be suppressed. The Government counters that the officers had reasonable suspicion with respect to Gerrish and that his detention was an investigatory stop in accordance with *Terry v. Ohio*, 392 U.S. 1 (1968).

"Included in the Fourth Amendment's protective ambit are *Terry* stops—those 'brief investigatory stops of persons or vehicles that fall short of traditional arrest.'" *United States v. Tiru-Plaza*, 766 F.3d 111, 115 (1st Cir. 2014) (quoting *United States v. Arvizu*, 534 U.S. 266, 273 (2002)). *Terry* stops are reasonable and thus do not violate the Fourth Amendment when officers have a reasonable suspicion that criminal activity may be afoot. *Id*. "Reasonable suspicion is a less exacting requirement than probable cause, but requires 'something more than an inchoate and unparticularized suspicion or "hunch."'" *Id*. at 116 (quoting *Sokolow*, 490 U.S. at 7). Whether reasonable suspicion exists is an objective inquiry under the totality of the circumstances. *Id*.

A *Terry* stop begins "when a reasonable person would not feel free to refuse to answer police questions and proceed along his way." *United States v. Dapolito*, 713

F.3d 141, 147 (1st Cir. 2013). But "[i]f an officer's actions during the encounter become 'too intrusive,' the temporary detention may 'morph into a de facto arrest,' which must be supported by probable cause." *United States v. Gonzalez*, 16 F.4th 37, 44 (1st Cir. 2021) (quoting *United States v. Rasberry*, 882 F.3d 241, 247 (1st Cir. 2018)). To distinguish between a *Terry* stop and a de facto arrest, "we inquire, in light of the totality of the circumstances, whether a reasonable person in the suspect's position would have understood her position 'to be tantamount to being under arrest.'" *United States v. Chaney*, 647 F.3d 401, 409 (1st Cir. 2011) (quoting *United States v. Zapata*, 18 F.3d 971, 975 (1st Cir. 1994)). "Where an investigatory stop is justified at its inception, it will generally not morph into a de facto arrest as long as 'the actions undertaken by the officers following the stop were reasonably responsive to the circumstances justifying the stop in the first place as augmented by information gleaned by the officers during the stop.'" *Id.* (alterations omitted) (quoting *United States v. Trueber*, 238 F.3d 79, 92 (1st Cir. 2001)). "This objective, suspect-focused inquiry is informed by our assessment of the reasonableness of the detaining officer or officers' actions in response to developing conditions." *Id.*

Gerrish primarily relies on *Sibron v. New York*, 392 U.S. 40 (1968). In *Sibron*, the Supreme Court reasoned that when an officer merely saw a defendant talking to people with known substance use disorders and saw nothing pass between them, "[n]othing resembling probable cause existed." *Id.* at 62; *see also Ybarra v. Illinois*, 444 U.S. 85, 91 (1979) ("[A] person's mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause to search that person."). However, the First Circuit has distinguished, for purposes of

6

probable cause, between "mere propinquity and culpable propinquity." *United States v. Lee*, 317 F.3d 26, 32 (1st Cir. 2003). Physical proximity to wrongdoing does not, standing alone, suffice, but probable cause may be found where there was "substantially more than a momentary, random, or innocent association . . . between" the defendant and suspected criminal activity. *Id.* at 33. More specifically, to analyze probable cause, the First Circuit has asked "whether the known criminal activity was contemporaneous with the association and whether the circumstances suggest that the criminal activity could have been carried on without the knowledge of all persons present." *United States v. Martinez-Molina*, 64 F.3d 719, 727, 729 (1st Cir. 1995). It bears repeating that "the level of suspicion required for a *Terry* stop is obviously less demanding than that for probable cause." *Sokolow*, 490 U.S. at 7.

When the officers detained Gerrish, he was situated differently from the defendant in *Sibron* who merely spoke to people with substance use disorders. Gerrish arrived with and then parked in a suspicious location with a woman who appeared ready to inject illegal drugs. Gerrish had been speaking with the woman's passenger. Gerrish's own passenger appeared impaired. The police were responding to a tip about drug trafficking at a site known for the same. Both cars were at a hotel suspiciously close to their registered addresses. Although Gerrish points to innocent explanations for many of these facts, "[u]nder *Terry*, the test is whether the circumstances give rise to a reasonable suspicion of criminal activity, not whether the defendant's actions are subject to no reasonable innocent explanation." *United States v. Stanley*, 915 F.2d 54, 57 (1st Cir. 1990). Given the timing of Gerrish's association with the woman flicking the syringe, the likelihood that he was aware of her conduct

7

due to his proximity to her and his communications with her passenger (and the fact that the syringe was visible to the officers 10 to 12 feet away), the apparent impairment of Gerrish's own passenger, and Gerrish's independently suspicious conduct (i.e., parking in a suspicious location close to the car's registered address), the officers had reasonable suspicion—a "minimal level of objective justification"—to initiate an investigatory detention of Gerrish. *Sokolow*, 490 U.S. at 7 (quoting *INS v. Delgado*, 466 U.S. 210, 217 (1984)).

Contrary to Gerrish's argument, the *Terry* stop did not morph into a de facto arrest before the search of his car such that probable cause was necessary for his detention. At all times leading up to the search, "the officers were assiduously engaged in activities in furtherance of the investigation." *Rasberry*, 882 F.3d at 248. The officers asked Gerrish who he was, granted his request to get out of the car, inquired about whether he was on bail conditions, investigated the nature of those conditions, and confirmed the conditions with dispatch. These steps were responsive to the original rationale for the stop—the reasonable suspicion of drug-related misconduct by Gerrish—as augmented by the developing circumstances, including Gerrish's confirmation that he was on bail conditions for "everything" and that those conditions allowed for suspicionless searches. Gerrish was not placed in handcuffs until after drugs were discovered in his car, and there is no evidence that the officers ever drew their weapons. Although five officers were present when the search was initiated and a police cruiser had blocked the car that Gerrish had parked next to, a reasonable person in Gerrish's position would not have interpreted the situation as an arrest, as opposed to an investigatory detention.

Thus, the officers did not violate Gerrish's Fourth Amendment rights when they initially detained him or at any point before their search of his car. I next analyze whether the search was constitutionally permissible.

**B.      The Bail Conditions**

Gerrish argues that his state bail conditions regarding suspicionless searches are unconstitutional. The Government responds that identical conditions have already been endorsed by the First Circuit and a court in this District.

In *United States v. Gates*, the First Circuit reasoned that the search of a defendant's house had been consented to and then, as an alternative basis for affirming the denial of the motion to suppress, concluded that the district court had "supportably found that the search was independently justified by the extant bail conditions." 709 F.3d 58, 64 (1st Cir. 2013). Like Gerrish's bail conditions, the condition in *Gates* provided that the defendant would submit to searches of his person, vehicle, and residence at any time without articulable suspicion or probable cause. *Id.* at 63. The First Circuit stated, "We see no reason why we should not give the plain language of such a bail condition force and effect." *Id.* at 64.

The approach suggested in *Gates* has since been embraced by multiple courts in this circuit. *United States v. Kissh*, 433 F. Supp. 3d 1, 4 (D. Me. 2020); *United States v. James*, Docket No. 2:17-CR-156, 2018 WL 2027084, at *6 (D. Me. May 1, 2018); *United States v. Drane*, Criminal No. 13-CR-31, 2014 WL 2940857, at *9 (D.N.H. June 30, 2014). Most recently, *Kissh* held that "[t]he Government can meet its burden of establishing consent to a search by pointing to bail conditions—agreed to by the Defendant—that permit such a search" and then "the burden shifts to the

9

Defendant to show that his bail conditions were unreasonable under the circumstances or that he did not fully understand them." 433 F. Supp. 3d at 4.

The Government introduced into evidence multiple sets of bail conditions demonstrating that Gerrish consented to searches without articulable suspicion or probable cause. Gerrish does not argue that these conditions were unreasonable under the circumstances or that he did not fully understand them. Rather, he argues, without explanation, that the constitutionality of the conditions did not survive *Maryland v. King*, 569 U.S. 435, 462-63 (2013). But a review of that decision reveals that it is inapposite because it analyzed—approvingly—the reasonableness of a very different type of search under quite different circumstances: DNA collection through cheek swabs from persons arrested for violent crimes or burglary. *See id.* at 443, 465.

Gerrish also argues that *Gates* conflicts with *United States v. Scott*, 450 F.3d 863 (9th Cir. 2006). In *Scott*, the Ninth Circuit held that probable cause was necessary to perform drug testing on a suspect on pretrial release or search his house notwithstanding his consent to such searches as a condition of his release. *Id.* at 865, 875. Gerrish argues that, under *Scott*, suspicionless searches authorized by bail conditions run afoul of the Fourth Amendment.

*Gates* was decided after *Scott*. Additionally, as explained in *Kissh*, the bail conditions at issue in *Scott* were not based on individualized findings by a judicial officer. *See Kissh*, 433 F. Supp. 3d at 4 n.3; *Scott*, 450 F.3d at 865, 872 & n.12. Here, Gerrish has not argued that his bail conditions were not based on individualized findings. This is not surprising because the Maine Bail Code requires judicial officers to determine the least restrictive combination of conditions that reasonably ensure,

among other goals, the appearance of the defendant at the time and place required based on enumerated considerations, including the history and characteristics of the defendant. *See* 15 M.R.S.A. § 1026(3)(A), 4(C) (West 2022). A Maine judicial officer's bail decision must be based on "an interview with the defendant, information provided by the defendant's attorney and information provided by the attorney for the State or an informed law enforcement officer[,] . . . and other reliable information." *Id.* § 1026(4). This process bears little resemblance to the one found wanting in *Scott*. *See Scott*, 450 F.3d at 865 ("There is no evidence that the conditions were the result of findings made after any sort of hearing; rather, the United States concedes that the conditions were merely 'checked off by a judge from a standard list of pretrial release conditions.'").

Because Gerrish has not shown that his bail conditions violate constitutional requirements, the plain language of the bail conditions governed the search and officers did not need articulable suspicion or probable cause for their search.

### III. CONCLUSION

Gerrish's Motion to Suppress (ECF No. 49) is **DENIED**.

**SO ORDERED.**

Dated: April 19, 2022

                                                                   /s/ **JON D. LEVY**
                                           **CHIEF U.S. DISTRICT JUDGE**