1            UNITED STATES DISTRICT COURT

2               DISTRICT OF MAINE

3    _____

4  UNITED STATES OF AMERICA,              CRIMINAL ACTION

5            Plaintiff              Docket No:  2:21-00132-JDL-1

6

7        -versus-

8

9  DEREK GERRISH,

10            Defendant
   _____

11                Transcript of Proceedings

12

13  Pursuant to notice, the above-entitled matter came on for
    **Sentencing** held before **THE HONORABLE JON D. LEVY,** United
14  States District Court Judge, in the United States District
    Court, Edward T. Gignoux Courthouse, 156 Federal Street,
15  Portland, Maine, on the 19th day of December 2022 at 2:09 p.m.
    as follows:

16

17  Appearances:

18  For the Government:   Lindsay Feinberg, Esquire
                          Assistant United States Attorney
19
    For the Defendant:  Robert C. Andrews, Esquire
20
    Also Present:  Jennifer Metcalfe, U.S. Probation
21

22                Lori D. Dunbar, RMR, CRR
                  Official Court Reporter
23
                (Prepared from manual stenography and
24                  computer aided transcription)

25

```
 1                    (Open court.  Defendant present.)

 2            THE COURT:  Good afternoon.  We are convening a

 3     hearing in the matter of the United States versus Derek

 4     Gerrish, Docket 21-CR-132.  Counsel, would you please note

 5     your appearances for the record.

 6            MS. FEINBERG:  Good afternoon, Your Honor.  Lindsay

 7     Feinberg for the Government this afternoon.

 8            THE COURT:  Good afternoon.

 9            MR. ANDREWS:  Good afternoon, Your Honor.  Robert

10     Andrews for Derek Gerrish.

11            THE COURT:  Good afternoon, thank you.  The record

12     will reflect also that Probation Officer Jennifer Metcalfe is

13     present.

14        Attorney Feinberg, was there anyone entitled to notice

15     under federal law -- is there anyone under federal law

16     entitled to notice of this proceeding?

17            MS. FEINBERG:  No, Your Honor, so no notice has been

18     provided.

19            THE COURT:  Thank you.

20        Mr. Gerrish, if you'll stand, please.  You are Derek

21     Gerrish, correct?

22            THE DEFENDANT:  Correct, Your Honor.

23            THE COURT:  Mr. Gerrish, this is your sentencing

24     hearing, and so the overall purpose of this hearing today is

25     for me to sentence you based upon your guilty plea and
```

1    conviction.  I'm going to be hearing from the attorneys and

2    I'll hear from you as well if you wish to speak, although

3    you're not required to speak.  It's only if you wish to.  And

4    I'll hear from anyone else who might be presented today.

5        We're going to begin with me asking you and Attorney

6    Andrews some questions.  The purpose of my questions are to

7    make sure, first of all, that you've received and read and

8    fully understand the revised presentence report prepared by

9    Officer Metcalfe in this case.  Secondly, I want to be sure

10   there's nothing that interferes with your ability to

11   understand what's taking place in court today.  And then,

12   third, overall I want to make sure that you understand the

13   sentence that I decide to impose and the reasons for it.

14       Now, if you don't understand a question that I ask you

15   don't try to answer it.  Just tell me that you don't

16   understand and I'll rephrase the question.  Do you understand?

17            THE DEFENDANT:  I do.

18            THE COURT:  And if you would like to speak with

19   Attorney Andrews before responding to a particular question,

20   let me know that and we'll make arrangements for that to

21   happen.  Do you understand?

22            THE DEFENDANT:  I do.

23            THE COURT:  Are you currently taking any

24   medications?

25            THE DEFENDANT:  No.

1          THE COURT:  Would you pull the microphone closer to

2    you, please?  Thank you.

3          Have you had any other types of drugs or alcohol in the

4    past 24 hours?

5          THE DEFENDANT:  No.

6          THE COURT:  Are you thinking clearly this afternoon?

7          THE DEFENDANT:  Yes.

8          THE COURT:  Is there anything at all that could

9    interfere with your ability to understand what's taking place

10   in court today?

11         THE DEFENDANT:  No.

12         THE COURT:  Do you authorize Attorney Andrews to act

13   and speak on your behalf today?

14         THE DEFENDANT:  I do.

15         THE COURT:  Attorney Andrews, have you carefully

16   reviewed and discussed with your client the revised

17   presentence report in this case?

18         MR. ANDREWS:  I have, Your Honor.

19         THE COURT:  Are you satisfied that he understands

20   it?

21         MR. ANDREWS:  I am, Your Honor.

22         THE COURT:  Mr. Gerrish, have you read the report

23   carefully?

24         THE DEFENDANT:  I have.

25         THE COURT:  Do you feel that you had sufficient time

```
 1    to discuss it with Mr. Andrews?

 2              THE DEFENDANT:  I have.

 3              THE COURT:  Do you feel that you understand it?

 4              THE DEFENDANT:  Yes.

 5              THE COURT:  Attorney Andrews, you've voiced a number

 6    of objections to the report, which were the subject of the

 7    presentencing memo -- the sentencing memo that you submitted

 8    as well as the Government.  And I'm going to hear from you and

 9    Attorney Feinberg on those points when you make your

10    presentations during sentencing.

11         Putting any points of objection that have already been

12    raised, are there any other objections to the information

13    contained in the presentence report?

14              MR. ANDREWS:  No, Your Honor.  I've tried to be as

15    thorough as I can in my objection letter submitted to the

16    Court.

17              THE COURT:  Thank you.

18         Mr. Gerrish, your lawyer has on your behalf put forward

19    several objections to the report itself, which I am going to

20    consider today and make decisions about.  But putting aside

21    the objections that they've -- that have already been

22    raised -- let me first ask you, are you familiar with the

23    objections that your lawyer has raised?

24              THE DEFENDANT:  I am.

25              THE COURT:  Putting those aside for a moment, do you
```

1  have any other objections or disagreement with the information

2  in the report?

3         THE DEFENDANT:  No, Your Honor.

4         THE COURT:  So is the information true to your

5  personal knowledge?

6         THE DEFENDANT:  Besides the objections, yes.

7         THE COURT:  Thank you, you can be seated.

8      Attorney Feinberg, I'll hear from the Government on the

9  matter of sentence.

10        MS. FEINBERG:  Thank you, Your Honor.

11     To begin, the Government has briefed what it believes

12 are all of the pending objections to the PSR in its sentencing

13 memorandum that's ECF No. 96.  Unless the Court has specific

14 questions about any points the Government raised therein, the

15 Government would ask to rest on its written pleadings as to

16 Mr. Gerrish's objections.

17        THE COURT:  Attorney Feinberg, the Government wasn't

18 specific in terms of your view about the appropriateness of a

19 variance from the guidelines based upon the distinction

20 between pure and nonpure methamphetamine as -- as that affects

21 the guidelines in this case.  Do you want to offer any further

22 comment on that as to what the Government's position is?

23        MS. FEINBERG:  Yes, Your Honor.  The Government

24 opposes any downward variance based on a categorical finding

25 from the Court based on the concentration or purity of

1    methamphetamine, and in so taking that position it's

2    consistent with the position the Government has consistently

3    brought before this Court.  Specifically, I think as Attorney

4    Andrews noted in his sentencing memorandum, Judge Singal

5    adopted the Government's view in a case known as Kaufman in

6    2019, and the Government continues to take that position

7    today.

8         The Government would further add that, as the Court may

9    be aware, on last Friday some guidance came down from the

10   Attorney General regarding considerations in charging going

11   forward.  Some of those considerations address specifically

12   the EQUAL Act and crack cocaine and powder cocaine going

13   forward.  I would note that nothing in that guidance gives

14   credence to the notion that the Court should adopt a

15   categorical downward variance based on the purity of

16   methamphetamine.

17        Going forward the Government would ask that the Court

18   calculate the guideline range as the sentencing guideline

19   commission has written it and therefore come up with a base

20   offense level of 32 as opposed to 30.

21             THE COURT:  And is it the Government's view that,

22   even if the Court were to not adopt a categorical rejection of

23   the guideline, that there still might be grounds for variance

24   in acknowledgment that there is no evidence here, that I'm

25   aware of at least yet, that Mr. Gerrish was sort of at the top

1    of the supply chain, which seems to be one of the assumptions

2    behind the guideline, and also that there's no proof or

3    evidence before me to suggest that he had knowledge of the

4    purity level of the methamphetamine that he was in possession

5    of?  What's your view on that?

6            MS. FEINBERG:  Typically, Your Honor, the Government

7    recognizes the Court of course has discretion, as the First

8    Circuit has made clear time and again, to vary downward based

9    on any number of reasons, whether it be categorical or

10   otherwise.  I think that's crystal clear in First Circuit

11   precedent, and the Government has no quarrel with that

12   position.  And the points that Your Honor raised may be valid

13   points for a downward variance.

14           However, the point the Government opposes, and we oppose

15   it here in particular based on our analysis of the 3553(a)

16   factors, which although the Court may not have evidence before

17   it that Mr. Gerrish was, as the Court categorized it, the top

18   of the supply chain or that he was aware of the purity of the

19   methamphetamine, nevertheless, I think an individualized

20   consideration of what the Court does have before it in the

21   revised PSR and what the Court does have before it in terms of

22   the facts would weigh in favor of a sentence within the

23   guideline range as calculated by probation.

24           THE COURT:  All right.  Please proceed.

25           MS. FEINBERG:  Thank you, Your Honor.

1    Turning to the 3553(a) factors, as to the nature and

2    circumstances of this offense, the offense that Mr. Gerrish

3    committed is a serious one, as the Court is aware, possession

4    of a large quantity of fentanyl with the intent to distribute

5    it to others.  And engaging in drug trafficking more generally

6    contributes to the very real and very damaging impact that

7    drugs, in particular opioids like fentanyl, have had and

8    continue to have on families, neighborhoods, and communities

9    across the District of Maine.

10    Some of the specific circumstances in Mr. Gerrish's case

11    are also quite troubling, including the fact that the overall

12    drug quantities that law enforcement seized from Mr. Gerrish's

13    vehicle were quite frankly enormous.  Between the passenger

14    compartment and the trunk, law enforcement seized a total of

15    approximately 876 grams of confirmed fentanyl, 336 grams of

16    confirmed methamphetamine, and along with comparatively

17    smaller quantities of cocaine base, MDMA, powder cocaine, MDA,

18    and oxycodone.  Your Honor, the Government submits that this

19    was a mobile drug bazaar.  The amount of drugs here was much

20    higher than I would suspect the Court sees day to day in cases

21    involving possession with intent to distribute fentanyl.

22    Coupled with that, Your Honor, is in close proximity to

23    these drugs and other tools of the drug trade, digital scale,

24    bowl and mixing cups with drug residue, were two firearms, one

25    of which had an obliterated serial number, as well as several

1    magazines and ammunition.

2        Turning to the history and characteristics of the

3    offender, the Government is troubled that this is not Mr.

4    Gerrish's first drug trafficking-related offense.

5    Specifically, turning to his adult criminal convictions,

6    there -- in 2015 when he was 25 years old Mr. Gerrish was

7    convicted, unlawful trafficking of scheduled drugs in the

8    state of Maine.  Notably the facts underlying that state case,

9    Your Honor, which approximately seven years ago, involved far

10   less drugs than are involved here, approximately 19 grams of

11   suspected heroin, drug ledgers, and currency.

12       In addition, this is not an isolated offense in Mr.

13   Gerrish's adult criminal history.  He also has several

14   convictions for assault-related offense, domestic violence,

15   and violating protective orders.  All of these are warning

16   signs, Your Honor, for somebody who is a real risk to the

17   community.

18       And despite being 31 years old at the time of the

19   instant offense, Mr. Gerrish has shown no sign of being

20   deterred from committing additional crimes, nor does he show

21   any sign of having aged out of the drug trade.  If the Court

22   looks at his conviction in 2015 and his conviction here, not

23   only do we have vastly more drugs involved, we now have guns

24   involved.  This is very troubling to the Government.

25       As a result, the Government submits that the need to

1  afford adequate deterrence and to protect the public from

2  further crimes by Mr. Gerrish weigh in favor of a lengthy term

3  of imprisonment.

4       Turning to the need to avoid unwarranted sentencing

5  disparities, under federal law a case involving more than 400

6  grams of confirmed fentanyl carries with it a 10-year

7  mandatory minimum if so charged.  The Government did not

8  charge Mr. Gerrish's case that way.  Nevertheless, the Court

9  should consider the fact that Mr. Gerrish possessed over

10 double that amount of drugs, again, in excess of 876 grams of

11 confirmed fentanyl, for which Congress has determined that a

12 10-year mandatory minimum is appropriate.

13      In view of the foregoing facts, the Government

14 recommends that the Court impose a sentence within the

15 guideline range, somewhere in the neighborhood of 144 months

16 or 12 years imprisonment.  This is a significant sentence,

17 Your Honor.  The Government acknowledges that.  But in the

18 Government's view a sentence of 144 months imprisonment is

19 warranted under the 3553(a) factors and the record before this

20 Court today.  Thank you.

21      THE COURT:  Thank you, Attorney Feinberg.

22  Attorney Andrews?

23      MR. ANDREWS:  Good afternoon, Your Honor.

24      THE COURT:  Attorney Andrews, if you would pull the

25 microphone back closer to you, please.  Thank you.

1            MR. ANDREWS:  Sure, Your Honor.  If I am not

2    speaking as loudly as I might normally in the courtroom, it's

3    simply a lack of practice, this being one of the first

4    occasions to be here in the building making a sentencing

5    argument.

6            I'd like to start with explaining how Derek Gerrish got

7    here.  Derek Gerrish was born into a family where this was

8    inevitable.  There was little or no chance that Derek was

9    going to avoid this situation.  In -- in my practice I have

10   heard it sort of referred to as Mr. Gerrish being the kind of

11   person who came by his drug problems and his criminal behavior

12   honestly, and what I think people mean by that is that from a

13   very young age not only did they get involved in criminal

14   behavior but they had families that were generationally

15   involved in criminal behavior.  And that's what happened here.

16           So Derek has a father who -- who -- well, other members

17   of the family have come, he has not, who -- who introduced him

18   into selling drugs at a very early age.  I think it was

19   probably around 10 years or maybe it was 11 years old that

20   the -- Derek's father thought that his children were ready to

21   take their place in his drug trafficking organization.  And it

22   wasn't just one day he said, hey, I want you to take this bag

23   of drugs to someone and I want you to bring back this certain

24   amount of money.  No, it started much earlier with a long

25   indoctrination.

1      When Derek was eight years old his mother died.  His

2   mother died of a drug overdose.  This is a fact that Derek

3   didn't know until much later in his life, a fact that was

4   concealed from him and his other siblings by his father.  And

5   what that tells me, Your Honor, is that -- that Derek's father

6   was manipulative in how he indoctrinated his children into

7   selling drugs.  And by not pointing out that their mother had

8   died from a drug overdose, these children had no real

9   emotional connection to the idea that selling and using drugs

10   would eventually lead to your death.

11      That's what happened to their mother.  Their father's

12   selling and involvement and using of drugs resulted in their

13   mother having a raging drug addiction, and while she didn't

14   die while she was with their father, it was certainly the

15   ramifications of his behavior that put her there.

16      What this meant for Derek was that when he was a little

17   boy he was mauled by a dog, and this left him with

18   considerable aftereffects, including PTSD.  And while there

19   was a court case and there was an award of funds for Derek to

20   get counseling and to get help, what -- what he didn't have

21   was a mother to comfort him, not just because eventually she

22   died but because the drugs made her absent, just like the

23   drugs made his father absent.  And so as a little boy he was

24   left to -- to cope with the nightmares and -- and the feeling

25   of dread and the anxiety of knowing that his life could end

1    within a dog attack.

2        Unfortunately things didn't get better.  Over the years

3    the Department of Health and Human Services would come around.

4    Part of the indoctrination that led to the normalization of

5    criminal behavior and selling drugs at a very young age was

6    you can't tell people what's really going on in a family.  And

7    the extent of that manipulation has followed Derek to this

8    very day.

9        So there were two things that were important.  You don't

10   talk to outsiders, you don't tell them about the abuse and

11   neglect that was happening to them, and you're committed to

12   the idea that the family stays together no matter what.

13       Well, for, I don't know, 25 years that made Derek act in

14   a particular way.  And when Derek was selling drugs and using

15   drugs he -- he understood that he -- he had to lie and he had

16   understood that the reason that you told lies was to hold his

17   family together.  Well, luckily that manipulation wasn't

18   strong enough to prevent Derek from doing the one thing that

19   he and his brother and his sister have now taken hold of and

20   introduced into their own lives, that selling and using drugs

21   will result in your death and that is more important than

22   maintaining our family.  And for the first time and for a long

23   time that's how Derek approached it.

24       Now, in my objective view of looking at what I've

25   learned about their family and about Derek, I've come to think

1  of their father as a monster.  He wasn't there because he was

2  selfishly using drugs when little Derek was attacked by a dog.

3  He wasn't there and able really to comfort and/or explain the

4  loss of his mother.  And all of those years that Derek was

5  growing up he -- he had fostered this hope that one day he

6  would be able to get out of the life that he found himself in,

7  and he had this -- this sort of expectation of one day he

8  would get the settlement from all this pain that he had been

9  suffering from a young -- as a young child into teenagers,

10  only to find out that his father had spent all the money.

11      Now, to me that's monstrous, right?  Not only did the

12  father not care for him, the father actively undermined him.

13  He didn't take responsibility for his role in his mother's

14  death or their mother's death, and instead of saying, yeah, I

15  spent the money because I'm a drug addict, he tried to explain

16  to his children and to Derek, whose money it was, that he

17  didn't do it because he needed to use drugs.  He did it

18  because he was caring for the family.  I don't think any of

19  that's true.  I think that we're here today in large part

20  because of Derek's father.

21      Now, I know Derek wants to address the Court and I'm

22  going to let him do that.  And when he's done I have one more

23  part to add, right, because there was a period of time

24  where -- where Derek made the choice to do right, and he

25  motivated himself and worked very hard and was very proud of

1   that success.  But one day that success evaporated.  Once

2   Derek is done giving his statement to the Court I'll explain

3   why.

4         THE COURT:  All right.  If you'll slide the

5   microphone back towards Mr. Gerrish.

6      Mr. Gerrish, I want to formally advise you as a

7   defendant about to be sentenced you have a right under our

8   Constitution to speak to me at this time.  But it's only if

9   you wish to speak; you're not required to speak.  And I take

10  it you do wish to speak; is that right?

11        THE DEFENDANT:  I do.

12        THE COURT:  Go ahead.

13        THE DEFENDANT:  I'd like to start by saying that,

14  you know, I take responsibility for my actions.  The amount of

15  drugs that were seized is not lost upon me.  The impact that

16  it has on families and society isn't lost on me.  If anything,

17  I -- I know firsthand.  But I do know that that's not the

18  person I want to be or the person I'm capable of being, that I

19  made a lot of poor choices to get in the situation that I'm

20  in.

21     I was in a really bad spot in my life.  Before that I --

22  I had made a really good life for myself.  I had a beautiful

23  and safe home.  I had a small handyman business.  I was

24  engaged to be married and be a stepfather to two young boys,

25  and I had a beautiful relationship with my daughter.  I taught

1    Sunday school at my local church.  I was a program manager and

2    a founding member of Journey House sober living in Sanford,

3    Maine, and I was always helping people get and stay sober, and

4    that's what brought me joy.

5        I was always trying to help everyone around me.  I was

6    compassionate and kind and I was a hard worker and a great

7    father.  I loved to take my daughter fishing and to catch

8    frogs and go to the park to play on the swings or take her to

9    ice cream after her soccer games.

10        It's not lost on me the impact that drugs have on

11    families because I experience it firsthand.  Long story short,

12    I was extremely proud of how far I had come and who I had

13    become until one day I wasn't.  Long story short, my

14    wife-to-be had stepped out on me and gotten pregnant by

15    another man.  It completely destroyed me inside, and I was

16    broken and sad and miserable and I eventually lost everything.

17    I stopped doing service work, I couldn't maintain my handyman

18    business, and I lost my sobriety.  I lost the privilege of

19    being a present father.  I had become miserable and hurt and

20    ashamed and guilty and bitter and hopeless.  I lost all hope

21    that -- that life could ever be good again.  I lost the desire

22    to even put it back together again, and to be quite honest I

23    don't think I cared whether to live or die at that point in my

24    life.

25        But getting arrested on June 1st, 2021, saved my life,

```
 1    gave me an opportunity to put that chapter of my life to rest
 2    and get out and start new.  It's given me an opportunity to
 3    work on myself, take a step back and just -- and learn myself
 4    and -- and just see where I've gone wrong and reflect and
 5    correct myself.
 6         It's restored my health and my outlook on life and my
 7    desire to be successful, and most of all I think it's restored
 8    my hope.  I know I'm capable of rehabilitation because I've
 9    done it before.  I'm capable of living a clean and meaningful
10    life.  I hope you can see that I'm worthy of mercy and grace,
11    and that's what I'm asking for, Your Honor, just for a little
12    bit.
13              THE COURT:  Thank you.
14              MR. ANDREWS:  Your Honor, so -- so the story --
15              THE COURT:  One moment.  Mr. Gerrish, you can be
16    seated.
17              MR. ANDREWS:  The story of how Derek learned about
18    his -- the woman he was going to marry's infidelity is --
19    is -- it's moving.  Derek was left in the care of one of the
20    boys who has a -- a seizure disorder.  He had a seizure when
21    he was with Derek, and Derek had to get him to the hospital.
22    And of course that -- that led to a lot of -- a lot of fear,
23    fear that he was somehow responsible.  And it led to a lot of
24    people treating him like he was responsible.
25         And one of the people who treated him like he was
```

1    responsible was the boy's father.  And the boy's father had

2    decided that Derek was out of line, I guess, that he didn't

3    have the right to care about his son.  And to put him in his

4    place, over text messages, over text messages, the boy's

5    father told Derek that he was still having a relationship with

6    the boy's mother, and the child that -- that she was carrying,

7    that Derek thought was his and he was preparing to care for,

8    just like he cared for her other children, wasn't his.  And it

9    destroyed him.  It -- it left him with nowhere to go and no

10   ability to think of what to do next.

11        And what he could have done is go to his sister.  So his

12   sister had taken some time to realize that drugs were a dead

13   end, too.  And after Derek got clean she was inspired to get

14   clean, and at the time she was clean but my assessment is that

15   she simply didn't have the strength to intervene when she saw

16   Derek fall.

17        But Derek went to his father because that's what he

18   thought he should do.  That's part of the indoctrination, the

19   part of go to dad, family matters, he'll take care of it.  The

20   problem is that Derek hadn't come along so far that he

21   recognized that his father wasn't going to help him; his

22   father was going to put him right back in the place he had

23   been before, and of course that's what happened.  Went to go

24   see his dad and instead of his dad saying, hey, what you need

25   to do is structure your life around your sobriety, what he

1    said was, here, have some drugs.  And Derek describes it as a

2    slow descent, although I have my doubts about that.  I suspect

3    it was very quick.  I suspect that he became a full-blown

4    addict and gave up very soon thereafter.  And that's how he

5    indoctrinated him.

6         Now, looking into the future, Your Honor, he has the

7    support of his family, and I know that his brother Kenny

8    wishes to address the Court, and I hope the Court will hear

9    from him now.  If you'd like to come forward, you can address

10    the Court.

11         THE COURT:  Sir, if you'll approach this microphone

12    here at the podium, walk through that gate and then walk up to

13    the microphone, please.  And when you get there tell us your

14    first and last name and spell your last name for us, please.

15         MR. GERRISH:  Yes.  My name is Kenneth Gerrish,

16    G-E-R-R-I-S-H, and I am Derek Gerrish's brother.

17         THE COURT:  All right, Mr. Gerrish.  Please proceed.

18         MR. GERRISH:  I would just like to -- I'm probably

19    going to read this.  I just want to say a few things real

20    quick.  Like, as you heard today in the court, that our

21    upbringing wasn't the best.  I feel that it was a setup to

22    fail, to be honest.  But I know as of now I'm 13 months sober

23    in recovery myself from drugs, and I have my own family.  I

24    have a two-year-old daughter.  And Derek -- Derek still helps

25    me every day, supports me mentally every day and encouraged my

1    sobriety.  So when I came home from federal prison in 2017

2    Derek was there for me, and as I will be for him.

3        And I know he's not the man some people say he is,

4    because I've known him 31 years of my life, and he's my best

5    friend.  And I'm just asking just as faith -- have faith and

6    hope, as I do.  And I know that I'm asking Your Honor like,

7    you know, mercy a little bit.  Like I have a daughter who

8    needs a family.  Me, her mother, my sister, my whole family's

9    sober, and like I -- I've -- I've built resentment to some

10   people but I've forgiven people for the past.

11       At the same time it's like I moved on with my life.  I'm

12   done with drugs and I know my brother is, too.  And -- as he

13   was for years, you know what I mean?  And I -- I've forgiven

14   myself for the past, and I'm just asking for some sort of

15   leniency.  You know what I mean, 12 years is a long time, sir,

16   and I know that.  My daughter will be a teenager when he comes

17   home, and I can't -- and it just hurts to think.  But as I

18   stand here today I just, you know, asking for some sort of

19   compassion and hope.  And that's all I got, sir, thank you.

20           THE COURT:  Thank you, Mr. Gerrish.

21           MR. ANDREWS:  Your Honor, in speaking with Derek's

22   sister Erika, it's too difficult for her and too stressful for

23   her to address the Court --

24           THE COURT:  Attorney Andrews, if you'll pull the

25   microphone back, please.  Thank you.

1          MR. ANDREWS:  What I'd like the Court to know is

2     that she's been sober for at least five years now, a fact that

3     she is incredibly proud of.  And to hear her tell it, it's for

4     her family.  And that's what the three of these children of

5     their father have going for them in the future, that they are

6     able and now willing to support each other in their sobriety.

7          Now, this is an extraordinarily long fall for Derek.

8     We're not asking for light sentences.  We're asking for a

9     significant sentence.  What we're asking this Court to impose

10    is a sentence of seven years.

11         And we do that for several reasons, the first of which,

12    Your Honor, is we don't believe that the guideline that's been

13    applied in this case is worthy of this Court's respect.  In

14    our sentencing memorandum we have in fact asked the Court to

15    declare a policy disagreement with the methamphetamine

16    guideline.  There have been courts within the First Circuit

17    that have in fact done that.  In fact, New Hampshire has, at

18    about the same time that Judge Singal decided not to.

19         There is an intervening fact since then.  And instead of

20    the judicially created discretion to decide what an

21    appropriate guideline range is, we have got the EQUAL Act.

22    And the EQUAL Act has said, well, we don't -- at least in the

23    case of crack/powder disparity, we don't understand why they

24    should be treated differently at all.  And now that Congress

25    has spoken in that regard, we think that that is an additional

1    reason to consider the idea that a similar disparity, the

2    disparity based on purity for methamphetamine, is another

3    situation where there should be no difference.

4         I've outlined why the majority of courts have said that

5    in my sentencing memorandum on behalf of Mr. Gerrish, and I'll

6    stick with that unless the Court has questions for that.  But

7    I -- I do urge the Court to think about that impact.  So if

8    someone were in a conspiracy and no drugs were seized from

9    them, they're likely to get charged with the more lenient

10   methamphetamine value.  But when you're like Derek and you get

11   seized -- you get actual methamphetamine seized from you, that

12   methamphetamine is of a high purity because that's the way it

13   comes.  It isn't the case, as is the assumption of the

14   guideline, that, well, if you've got pure methamphetamine you

15   must be higher on the chain.  Well, as a marketing tool,

16   whoever's in charge of that has changed that.  Now when you

17   get methamphetamine chances are it's crystalline and chances

18   are it's unadulterated and chances are it's of sufficient

19   purity for the higher guideline, even when you're basically a

20   street dealer like Mr. Gerrish was.

21        I know she -- Miss Feinberg described him as someone

22   with an enormous amounts of drugs, but that didn't mean that

23   he was high on the supply chain.  The evidence in this case

24   was that he was selling people grams and eight balls, hand to

25   hands from a hotel room.  And -- and there are state cases

1    that sort of corroborate that same hand-to-hand,

2    small-amount-kind-of-guy stuff.

3        So in my view the evidence is sufficient to say he's not

4    high up on the chain; he's low on the chain.  He's a street

5    dealer.  And I think that is also another reason that if the

6    Court isn't prepared to have a stated policy disagreement with

7    the guideline categorically that that is a reason to -- to

8    have a variant sentence for Mr. Gerrish, despite the

9    significant amount of drugs that were seized from him.

10        The other issue that I bring before the Court, and I

11    think my presentation sort of shows this, is that he's come

12    from an incredibly disadvantaged childhood, one that is

13    generational and -- in the negative consequences of drugs in

14    our society and what that results in.  And I think that

15    leniency is appropriate here.

16        I'm asking Your Honor for a seven-year sentence.  Seven

17    years is not insignificant.  It is sufficient for purposes of

18    deterrence.  Nobody wants to go to federal prison for seven

19    years.  It's a long time.  But Derek Gerrish -- Derek doesn't

20    want to go to prison for a day longer than he has to, which of

21    course brings me to the so-called parsimony provision, a

22    sentence that is not longer than necessary.  And I think seven

23    years is significant.  And -- but it also recognizes that

24    Derek can recover.

25        And one of the things that -- that I would like to point

1   out to the Court in my experience over the past 27 years of

2   doing this, that people who do a long time in there's a cutoff

3   point, a cutoff point where you become institutionalized and

4   it becomes very difficult to recover from that sentence.  And

5   I think that that cutoff period, at least in my experience, is

6   somewhere around 10 years.

7       Seven years is significantly shorter than that 10-year

8   cutoff.  That would give Derek a chance to make good on what

9   he started to make good before it all fell apart.  And now

10  that he's learned how to put it back together -- and if you

11  remember, Your Honor, there was a -- we had asked for -- to

12  delay the sentencing so that he could complete a program.

13      And I -- I have some exhibits, Defendant's Exhibit 1,

14  which are the certificates that were related to his completion

15  of that program so that the Court knows that not only did he

16  ask for it but that he followed through on it.  And I think

17  that important.  And -- because Derek can follow through on

18  it.

19      What motivated Derek when he was in recovery was the

20  pride he had in helping other people but also the respect that

21  people gave him, the -- the good jobs, the atta boys, the I'm

22  glad you're doing this.  That's what motivated him.  And while

23  he didn't understand that it wasn't just that that he had to

24  do, that he had to work on himself, he's realized that now,

25  he's explained to this Court that that's what he intends to do

1    over the period of his incarceration, which is almost surely

2    coming.

3        Your Honor, the last thing that I ask is that he's asked

4    a recommendation -- for a recommendation that he be sentenced

5    and held at Schuylkill while in Bureau of Prisons custody.

6        Your Honor, that's all that I have.  And if the Court

7    has specific questions about my either sentencing brief or the

8    objections I made to certain material that's been included in

9    the presentence report, I'd be happy to respond to them.

10           THE COURT:  Tell me again the facility where he's

11   requesting that I recommend he be located.

12           MR. ANDREWS:  Schuylkill, Your Honor, in New York.

13           THE COURT:  What's the reason for that request?

14           MR. ANDREWS:  Your Honor, he -- I think it's because

15   his brother has been there, and he thinks that that will be

16   sort of in the range of places you could go that would be a

17   place that he would prefer because he can get programs there

18   and he can get help.

19           THE COURT:  Thank you.

20           PROBATION OFFICER:  May I approach?

21           THE COURT:  Yes.

22      (The Court conferred with the probation officer.)

23           THE COURT:  It is of course the general practice

24   when we conduct sentencings in court for -- at the conclusion

25   of the parties' presentations for the judge to then go through

1    the guidelines that apply here, discuss the sentencing

2    factors, and then announce a sentence in relation to the

3    particular facts that are presented.  I'm not going to follow

4    that course today because I've decided that I want to give

5    further reflection to the arguments that the attorneys have

6    made with respect to the guidelines as they apply in this

7    case.  The question specifically of whether the Court should

8    categorically disagree with a policy decision made by the U.S.

9    Sentencing Commission is an important question, and it's not

10   one that I wish to address without very careful reflection.

11        Now, it's already been mentioned that there are two

12   decisions, relatively recent decisions, from judges of the

13   First Circuit, one from this district, addressing that legal

14   question and which went in opposite directions.  In addition,

15   this is a case in which, on the one hand, the circumstances

16   associated with Mr. Gerrish's possession of drugs at the time

17   of his arrest and possession of firearms and other -- and

18   other related items, on the one hand, and his really uniquely

19   dysfunctional childhood, having been brought up by parents who

20   were drug users, a father who was a drug dealer, and basically

21   introduced to that way of life at such a young age make this,

22   it seems to me, a particularly both complicated and important

23   sentencing, one in which it seems to me my thought process

24   will benefit by careful reflection, additional careful

25   reflection.

1          And so for that reason I'm not going to render sentence

2     today.  I'll take this under advisement and we'll reconvene,

3     at which time I will announce my conclusions.  The clerk's

4     office will be in touch with counsel to reschedule this matter

5     in several weeks.  I want to thank the attorneys for their

6     presentations today.  I guess it should already be clear from

7     the comments that I've made that I think that you presented

8     some very important questions, and I will carefully consider

9     them.

10         Before we adjourn for the day, Attorney Feinberg,

11    anything else from the Government?

12              MS. FEINBERG:  Just a clarifying question, Your

13    Honor.  In taking this matter under advisement, do you want

14    the parties to submit any further briefing to the Court?

15    Would that be helpful, or does the Court simply want to

16    consider the presentations as they stand today?

17              THE COURT:  I'll let you know.

18              MS. FEINBERG:  Thank you.

19              MR. ANDREWS:  Your Honor, I just -- so one of the

20    things that I -- the Government had briefed some objections

21    and I didn't reciprocate in my memo.  I do have case law, if

22    the Court would like me to provide those citations, that sort

23    of flesh out that argument.  I'm happy to provide them.

24              THE COURT:  Which argument are you referring to?

25              MR. ANDREWS:  The use of certain information that

```
 1    was included both in his criminal conviction -- describing the

 2    criminal convictions, the other pending criminal conduct, the

 3    facts that were used to describe that other criminal conduct,

 4    and other arrests and the facts that were associated with

 5    those other arrests.

 6              THE COURT:  Actually I think it would be beneficial

 7    for you to supplement what you provided, to provide some

 8    explanation of those positions, and I'll give the Government

 9    the chance to respond if it wishes.

10              MS. FEINBERG:  Yes, thank you, Your Honor.

11              THE COURT:  And so, Attorney Andrews, I'm going to

12    ask that you submit your memo no later than one week from

13    today.  Is that a problem, given the holiday schedule?

14              MR. ANDREWS:  No, Your Honor.  In fact, I think I

15    can get it in by Friday, but I'm not sure about that.

16              THE COURT:  All right.  Well, let's make it one week

17    from today.  And then, Attorney Feinberg, also mindful of the

18    holiday schedule, if you have a week to reply is that

19    sufficient?

20              MS. FEINBERG:  Your Honor, apologies, I am out all

21    of next week, and then I have an argument before the First

22    Circuit the week thereafter, so if we could have maybe two

23    weeks from when Attorney Andrews submits his brief?

24              THE COURT:  That's fine.

25              MS. FEINBERG:  Thank you.
```

1          MR. ANDREWS:  Your Honor, and I just would also like

2    to bring the Court's attention that I think it's the 11th and

3    the 12th or maybe it's the 12th and 13th I will also be in the

4    First Circuit arguing so --

5          THE COURT:  Okay.  We'll take that into

6    consideration.  Again, the clerk's office can be in touch with

7    you.  Let me just pause for a moment.

8               (The Court conferred with the clerk.)

9          THE COURT:  All right.  As I said, the clerk's

10   office will be in touch with you with respect to the actual

11   date for the continuation of this hearing.  Anything else?

12         MS. FEINBERG:  No, Your Honor, thank you.

13         THE COURT:  Anything else?

14         MR. ANDREWS:  Nothing further, Your Honor.

15         THE COURT:  All right.  Again, the clerk's office

16   will be in touch to reschedule this matter, and with that we

17   stand adjourned.  Thank you.

18               (Time noted:  2:55 p.m.)

19

20

21

22

23

24

25

1                          **C E R T I F I C A T I O N**

2    I, Lori D. Dunbar, Registered Merit Reporter, Certified

3    Realtime Reporter, and Official Court Reporter for the United

4    States District Court, District of Maine, certify that the

5    foregoing is a correct transcript from the record of

6    proceedings in the above-entitled matter.

7    Dated:  June 22, 2023

8                    /s/ Lori D. Dunbar

9                    Official Court Reporter